**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| STATE OF NORTH DAKOTA, | |
|     Plaintiff, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; BUREAU OF LAND MANAGEMENT; JON RABY, in his official capacity as the Acting Director of the Bureau of Land Management; SONYA GERMANN, in her official capacity as the Montana/Dakotas State Director of the Bureau of Land Management, | Civil No._____ |
|     Defendants. | |

## COMPLAINT FOR REVIEW OF FINAL AGENCY ACTION

The State of North Dakota seeks judicial relief from two final actions of the United States Department of the Interior and Bureau of Land Management: (1) the North Dakota Field Office Record of Decision and Approved Resource Management Plan, published in the Federal Register at 90 Fed.Reg. 3915 (Jan. 15, 2025), attached hereto as **Exhibit A**; and (2) the Final Environmental Impact Statement for the North Dakota Proposed Resource Management Plan, published in the Federal Register at 89 Fed.Reg. 65391 (Aug. 9, 2024) attached hereto as **Exhibit B**.

## INTRODUCTION

1. In the final days of the Biden Administration, and over the State's strong and repeated objections, the Bureau of Land Management ("BLM") radically revised the policy for developing federal land and resources in North Dakota by finalizing the North Dakota Field Office Record of Decision and Approved Resource Management Plan ("Amended RMP")**.**

1

2. The Amended RMP is an overarching land and resource development plan that dictates management decisions for land and mineral interests that are owned by the federal government within North Dakota. However, due to the checkerboard-like nature of federal land and mineral estates across much of North Dakota, it will have incredibly significant impacts on the development of State- and privately-owned lands and mineral interests throughout the State.

3. The previous RMP for the State of North Dakota was developed in 1988. That 1988 RMP generally balanced the competing purposes of the public lands in a way that allowed for the efficient and responsible development of natural resources and has been the basis for effective cooperation between the State and federal government for decades.

4. The Amended RMP shreds that spirit of State-federal cooperation to impose draconian and irrational restrictions on the development of traditional energy resources that will affect the State for decades to come. As just one example of its draconian and irrational restrictions on resource development (among many), the Amended RMP categorically prohibits all future development of federally owned coal interests outside of a 4-mile radius from current development.

5. The Amended RMP violates multiple federal statutes, is arbitrary and capricious, and it should be vacated several times over. But of equal concern to its substance is the manner by which BLM promulgated it. This is a North Dakota-focused rule, and the State of North Dakota repeatedly voiced serious concerns with the proposal and the assessments that underly it. But rather than meaningfully addressing those concerns—as it was required to do by statute—the prior Administration chose to finalize this rulemaking during its closing weeks, disregarding the State's repeated protests. The Amended RMP is not only unlawful and unwise, but it is also emblematic of everything that was wrong with the prior Administration's approach to cooperative federalism for regulations that impact traditional energy development and the environment.

## PARTIES

6. Plaintiff North Dakota is a sovereign State of the United States of America and obtains a large share of its revenue directly and indirectly from the development of natural resources. Drew Wrigley is the Attorney General of North Dakota and is authorized to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state." N.D.C.C. § 54-12-01(2).

7. Defendant United States Department of the Interior is an Executive Branch agency that administers land and mineral estates owned by the Federal Government in North Dakota.

8. Defendant Secretary Doug Burgum[1] is Secretary of the United States Department of the Interior. Secretary Burgum is sued in his official capacity.

9. Defendant BLM is a sub-component of the Department of the Interior. BLM is responsible for promulgating the Amended RMP and NEPA assessment challenged in this lawsuit.

10. Defendant Jon Raby[2] is Acting Director of the Bureau of Land Management. Acting Director Raby is sued in his official capacity.

11. Defendant Sonya Germann is the Montana/Dakotas State Director for the Bureau of Land Management. State Director Germann is sued in her official capacity.

## JURISDICTION AND VENUE

12. The Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 28 U.S.C. § 1331; 5 U.S.C. §§ 701–06. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, and its inherent equitable powers.

---

[1] The challenged actions were finalized during the tenure of the former Secretary of the Interior.

[2] The challenged actions were finalized during the tenure of the former Director of BLM.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because Plaintiff State of North Dakota resides within the District of North Dakota and because property subject to the action is situated in the District of North Dakota.

## BACKGROUND

### I.     Statutory Background

#### A.     Federal Land and Policy Management Act ("FLPMA")

14.     BLM's management of public lands is governed by the Federal Land Policy and Management Act of 1976 (codified at 43 U.S.C. §§ 1701 *et seq*).  "At its core, FLPMA is a land use planning statute." *Wyoming, et al. v. U.S. Dep't of Interior*, 493 F.Supp.3d 1046, 1063 n.16 (D. Wyo. 2020), *vacated as moot*, 2024 WL 3791170 (10th Cir. Aug. 13, 2024); *see also* 43 U.S.C. § 1712(a) ("The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans…").

15.     "Public lands" means "any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership[.]"   43 U.S.C. § 1702(e).  FLPMA does not authorize BLM to regulate or control non-federal lands.

16.     Under FLPMA, BLM is required to develop resource management plans ("RMPs") to guide its land management decision-making. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 59 (2004).  RMPs are a "preliminary step in the overall process of managing public lands— 'designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses.'"  *Id.* at 69 (citation omitted).  An RMP provides overarching direction for the present and future use of public lands and their resources by establishing management priorities and actions in the relevant region.

17.     Congress directed BLM to ensure that its RMPs: (1) "use and observe the principles of

multiple use and sustained yield"; (2) "use a systematic interdisciplinary approach"; (3) "give

priority to the … protection of areas of critical environmental concern"; and (4) "weigh long-term

benefits to the public against short-term benefits." 43 U.S.C. § 1712(c). BLM "shall manage the

public lands" in accordance with these plans. *Id.* § 1732(a). "[M]ineral exploration and

production" are among the FLPMA's "principal or major uses" of public lands. *Id*. § 1702(l).

18.    In FLPMA, Congress declared that it is the policy of the United States "that management

[of public lands] be on the basis of multiple use and sustained yield unless otherwise specified by

law." 43 U.S.C. § 1701(a)(7). FLPMA defines the term "multiple use" as:

> … the management of the public lands and their various resource
> values so that they are utilized in the combination that will best meet
> the present and future needs of the American people; making the
> most judicious use of the land for some or all of these resources or
> related services … to conform to changing needs and conditions; the
> use of some land for less than all of the resources; a combination of
> balanced and diverse resource uses that takes into account the long-
> term needs of future generations for renewable and nonrenewable
> resources, including, but not limited to, recreation, range, timber,
> minerals, watershed, wildlife and fish, and natural scenic, scientific
> and historical values; and harmonious and coordinated management
> of the various resources without permanent impairment of the
> productivity of the land and the quality of the environment with
> consideration being given to the relative values of the resources and
> not necessarily to the combination of uses that will give the greatest
> economic return or the greatest unit output.

*Id.* § 1702(c).

19.    Congress defined the term "sustained yield" as "the achievement and maintenance in

perpetuity of a high-level annual or regular periodic output of the various renewable resources of

the public lands consistent with multiple use." 43 U.S.C. § 1702(h).

20.    FLPMA also imposes detailed procedural requirements on any substantial change in land

management policy. *See, e.g.,* 43 U.S.C. §§ 1739(e), 1712(f), & 1714(h). This includes express

limitations on the authority of the Secretary to withdraw large amounts of federal lands and

resources from development. *See* 43 U.S.C. § 1714 (requiring Congressional approval for withdrawals of 5000 acres or more and a public hearing for non-emergency withdrawals).

21.    When developing an RMP, BLM's FLPMA-implementing regulations require the "meaningful public involvement" of other federal agencies, state and local government officials, and federally recognized Indian tribes. 43 C.F.R. § 1610.3-1(a)(4). BLM must invite agencies, governments, and Tribes to participate as cooperating agencies, and provide opportunities for review and advice on resource management plan topics that may affect other agency or government programs. 43 C.F.R. § 1610.3-1.[3] BLM must develop land use plans that "are consistent with State and local plans *to the maximum extent*" and ensure such plans are "consistent with Federal law and the purposes of [the] Act." 43 U.S.C. § 1712(c)(9) (emphasis added).

22.    To facilitate coordination with state governments, the regulations also direct BLM's State Directors to "seek the policy advice of the Governor(s) on the timing, scope and coordination of plan components; definition of planning areas; scheduling of public involvement activities; and the multiple use opportunities and constraints on public lands." 43 C.F.R. § 1610.3-1(c).

23.    The BLM State Director must submit a copy of the proposed RMP to the relevant state governor and provide an opportunity for the governor to "identify any known inconsistencies with State or local plans, policies or programs" prior to approving any recourse management plan. 43 C.F.R. § 1610.3-2(e). This "consistency review" procedure provides administrative rights of appeal if BLM does not adopt the governor's recommendations. 43 C.F.R. § 1610.3-2(e).

---

[3] A Cooperating Agency is an entity that provides input to support a NEPA analysis because it has legal jurisdiction or because it has special expertise with respect to the environmental issues associated with a project. 40 C.F.R. § 1501.8. North Dakota signed on as a Cooperating Agency in the RMP planning process in October 2023, **Exhibit A** at 1-9, and State agencies that participated in that process included the North Dakota Governor's Office, the North Dakota Industrial Commission, the North Dakota Department of Trust Lands, the North Dakota Public Service Commission, and the North Dakota Department of Water Resources. *Id.* at 1-10.

24.    Additionally, any person who participated in the planning process and may be adversely affected by the RMP may protest the approval of the RMP pursuant to the procedures in 43 C.F.R. § 1610.5-2.  The regulations require the BLM Director to render a written decision on the protest and provide the reasons for the decision.  43 C.F.R. §1610.5-2(a)(3).  "The decision of the Director shall be the final decision of the Department of the Interior."  43 C.F.R. §1610.5-2(b).

25.    If BLM receives protests to a proposed RMP, the State Director must withhold final approval on the protested portion of the RMP until providing an opportunity for public notice and comment regarding any significant change to the proposed plan.  43 C.F.R. §1610.5-1(b).

26.    BLM's regulations provide that the "State Director shall approve the plan."  43 C.F.R. §1610.5-1(b).  And the RMP approval "shall be documented in a concise public record of the decision" which meets the requirements of the NEPA regulations.  43 C.F.R. §1610.5-1(b).

**B.    National Environmental Policy Act ("NEPA")**

27.    NEPA imposes substantial procedural requirements to ensure that federal agencies "will have available, and will carefully consider, detailed information concerning significant environmental impacts."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.*  "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  *Id.*

28.    Under the NEPA-implementing regulations, there are three levels of review for agencies to assess the potential impacts of proposed federal actions: an Environmental Impact Statement (EIS), an Environmental Assessment (EA), or a Categorical Exclusion (CE).  *See Dept. of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).

29.    An EIS is "a detailed written statement" and the most comprehensive of these three levels

of NEPA review.  *See* 42 U.S.C. § 4336e(6).  An EIS is required when an agency proposes a major federal action that will significantly affect the quality of the human environment.  *See* 42 U.S.C. § 4332(C).  BLM's regulations require that the agency must prepare an EIS when BLM issues or amends an RMP.  43 C.F.R. § 1601.0-6.

30.   When issuing an EIS, NEPA requires that the agency must: (a) consider reasonable alternatives to the proposed action; and (b) take a "hard look" at the environmental consequences of the decision.  *Robertson*, 490 U.S. at 350; *see also* 42 U.S.C. § 4332(C)(i)-(iii).[4]

### 1.    Reasonable Alternatives

31.   An EIS must evaluate a "reasonable range of alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii).  Because the EIS is supposed to guide the agency's decision-making process, "the alternatives analysis is naturally 'the heart of the environmental impact statement.'" *Oregon Nat. Desert Ass'n v. BLM,* 625 F.3d 1092, 1100 (9th Cir. 2010) (quoting 40 C.F.R. § 1502.14).  The EIS must "rigorously explore and objectively evaluate all reasonable alternatives," and the "*existence of a viable but unexamined alternative renders an environmental impact statement inadequate*."  *Id.* (emphasis added) (citations omitted); *see also* United States Department of the Interior, Bureau of Land Management, National Environmental Policy Act Handbook ("NEPA Handbook"), H–1790–1 at § 9.2.7.1 (2008).

32.   The analysis for an EIS must include "every reasonable alternative" in order to ensure an informed choice from a full range of options.  *Protect Our Communities Found. v. LaCounte,* 939 F.3d 1029, 1038 (9th Cir. 2019); *see also Mayo Found. v. Surface Transp. Bd.*, 472 F.3d 545, 550

---

[4]This Court has recognized that the Council on Environmental Quality ("CEQ") does not have congressionally delegated authority to issue binding regulations and can merely promulgate non-binding guidelines. *Iowa v. CEQ*, No. 1:24-cv-00089, Dkt. 145 ¶¶36-60 (D.N.D. Feb. 3, 2025). This Complaint focuses not on BLM's failures to comply with CEQ regulations, but on BLM's failure to satisfy the requirements of the NEPA statute.

(8th Cir. 2006) (agency is "required to consider *all* 'reasonable' alternatives") (emphasis added).

33.    When an agency fails to consider a reasonable alternative—such as a middle-ground alternative—that failure violates the requirements of NEPA.  *E.g., Friends of Boundary Water Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999) ("[A] viable but unexamined alternative renders [the] environmental impact statement inadequate.") (citation omitted).

### 2.    NEPA's "Hard Look"

34.    NEPA also requires that federal agencies "take a 'hard look' at the environmental consequences before taking a major action."  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97 (1983).  The purpose of the "hard look" requirement is to ensure that the "agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Id.* at 97-98.

35.    The scope of analysis for an EIS "must be appropriate to the action in question."  *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072-74 (9th Cir. 2002) (holding that a cursory, two-sentence statement was "obviously inadequate")*.*

### C.    The Mineral Leasing Act ("MLA")

36.    The Mineral Leasing Act, 30 U.S.C. § 181 *et seq*., established the framework for leasing federally owned mineral interests.  The purpose of the MLA is "[t]o promote the mining of coal, phosphate, oil, oil shale, and odium on the public domain."  Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437 (emphasis added).  Like FLPMA, the MLA does not authorize federal regulation of non-federal mineral interests or non-federal lands.

37.    The MLA "governs the leasing of public land for coal production" by authorizing the Secretary of the Interior to offer lands classified for coal leasing through a competitive leasing process. *Citizens for Clean Energy v. U.S. Dep't of Interior*, 384 F. Supp. 3d 1264, 1272 (D. Mont. 2019) (quoting 30 U.S.C. § 201(a)(1)).  All federal coal deposits subject to leasing must be

included in a comprehensive land use plan prepared in consultation with the relevant state, agencies, and local governments.  30 U.S.C. § 201(3)(A).

38.    The MLA also "promote[s] the orderly development of oil and gas deposits in publicly owned lands … through private enterprise, and to obtain for the public reasonable financial returns on assets belonging to the public."  *Wyoming*, 493 F.Supp.3d at 1062 (citations omitted).

39.    To avoid waste and protect correlative rights for mineral reservoirs, the MLA authorizes federal, state, and private owners to form cooperative management units, known as "communitization agreements," which pool adjacent mineral interests for efficient development. *See* 30 U.S.C. § 226(m) ("For the purpose of more properly conserving the natural resources of any oil or gas pool … lessees thereof and their representatives may unite with each other … in collectively adopting and operating under a cooperative or unit plan of development.").  This authority is limited and requires the "consent of the holders of leases involved."  *Id*.  Further, the MLA's grant of authority to DOI and BLM to enter communitization agreements explicitly recognizes that States retain their sovereign rights for managing the development of non-federal minerals.  *See* 30 U.S.C. § 189 ("[n]othing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have").

**D.    The Administrative Procedure Act ("APA")**

40.    The Administrative Procedure Act, 5 U.S.C. §§ 701, et seq., requires that all federal agencies must engage in "reasoned decisionmaking" in order to reach decisions that are "within the scope of [their] lawful authority'" through a "logical and rational" process. *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (citations omitted).

41.    "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  When a statute does not contain an independent right to judicial review,

the final agency action is reviewable under the APA.  5 U.S.C. § 704.

42.    The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction," or which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

## II.    Factual Background

### A.    Checkerboard Nature of Federal Mineral Interests in North Dakota

43.    BLM manages approximately 4 million acres of mineral estate in North Dakota.  While there are a few large blocks of federal mineral ownership across the State, the vast majority of mineral estates owned by the federal government in North Dakota are small parcels scattered across the State in a checkerboard-like manner.

44.    The reason for that checkerboard-like array of federal mineral interests in North Dakota is historical in origin.  Unlike many western States with a heavy BLM presence, more than 97% of North Dakota's land used to be either privately-owned or State-owned as a result of the railroad and homestead acts of the late 1800s.  However, during the depression and drought years of the 1930s, many small tracts in the State went through foreclosure, resulting in the federal government taking ownership of both the mineral and surface estates through the Federal Land Bank and the Bankhead Jones Act.  The federal government later sold many of those surface estates, but it retained ownership for many of the small, scattered mineral estates—creating a checkerboard-like array of split estates and small pockets of federal mineral interests across the State.

45.    Because "mineral deposits don't always follow plat lines," *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1254 (10th Cir. 2014) (Gorsuch, J.), North Dakota, like many oil and gas producing States, manages oil and gas development with regulatory structures that involve the pooling (or "communitization") of mineral interests in shared reservoirs.  *See* N.D.C.C. § 38-08-08.  As a result of the checkerboard-like array of federal mineral interests across the State,

efficient and equitable mineral development in North Dakota frequently requires the use of communization agreements to jointly develop the federal interests that are intermingled with State-owned and privately owned interests in oil and gas spacing units. Virtually all federal oil and gas interests in North Dakota are pooled with State or private interests to some extent, and over 30% of the spacing units in North Dakota contain federal mineral interests.

46.    The checkerboard-like array of federal mineral interests also impacts coal development in North Dakota. To efficiently conduct surface mining and reclamation operations, operators must secure leases for large, contiguous areas. In North Dakota, the large contiguous areas necessary for the efficient development of coal deposits are likely to include at least some number of small federal interests. If operators were required to avoid those federal mineral interests when mining and reclaiming a given area, mining operations across the State would be fractured and far less efficient. That is because rather than efficiently mining across the entire coal seam, mining operations would need to be redirected around small, scattered islands of federal interests. Moreover, due to stabilization requirements, operators would be unable to mine up to the lease boundary even for non-federal interests, stranding a ring of privately-owned and State-owned minerals around each island of the federal minerals prohibited from development.

47.    This Court has recognized the practical effects that this checkerboard, split estate system has on North Dakota and North Dakota property owners when the federal government unlawfully restricts federal mineral development. *See North Dakota v. U.S. Dep't of Interior*, No. 1:21-cv-00148, Dkt. 98 (D.N.D. Mar. 27, 2023). As this Court noted, when "there are unleased federal minerals to a spacing unit subject to a [communitization agreement]," there is a substantial threat of "leaving certain state- and privately-owned interests untapped (i.e., creating 'waste') for fear of penetrating unleased federal mineral interests, which, if tapped, could result in federal

prosecution." *Id.* at ¶132. Consequently, in that case (which involved BLM failing to meet its statutory duties for leasing federal minerals) BLM was "ENJOINED and RESTRAINED from *de facto* withdrawing lands in North Dakota identified for oil and gas development in their respective RMPs without following the statutory procedures for public notice and comment as well as congressional notice, where appropriate." *Id.* at ¶147.

### B.    The 1988 North Dakota Resource Management Plan

48.    The 1988 Resource Management Plan for North Dakota ("1988 RMP") is a comprehensive framework for managing the development of federal resources in the State that was grounded in the principles of multiple use and sustained yield.  It balances various interests in the State, such as recreation, wildlife protection, grazing, and mineral development.

49.    The 1988 RMP has provided a solid, flexible foundation for BLM and the State to navigate the Bakken Shale boom[5] and the responsible development of North Dakota's abundant coal, oil, natural gas, and other resources.  Operating pursuant to that RMP, North Dakota has become a significant energy producer and exporter, benefitting the State, the region, and the entire nation.  And where conflicts have arisen, the 1988 RMP provided a framework for resolving claims to competing uses and identifying paths for responsible development.

50.    North Dakota and its citizens have developed significant reliance interests on the federal government acting like a responsible, rational partner, and providing a stable and reasonable framework that balances the potential uses of federal resources in North Dakota.

### C.    The Proposed Rule and BLM's NEPA Assessment

51.    BLM published draft amendments to the RMP and a draft EIS on January 20, 2023.  *See* 88 Fed.Reg. 3757.  After notice-and-comment, BLM then published its proposed amendment to

---

[5] The Bakken Shale Formation is a significant geological formation known for its rich deposits of oil and natural gas, spanning parts of North Dakota, Montana, and Canada.

the North Dakota RMP on August 9, 2024.  *See* 89 Fed.Reg. 65391 (Aug. 9, 2024).  At the same time, BLM also published its final EIS assessment in support of amending the North Dakota RMP. *See generally* **Exhibit B** (the "Final EIS").

52.   In that Final EIS, BLM defined and considered five RMP alternatives—Alternatives A, B, B.1, C, and D.  Alternative A was the No Action Alternative and represented the status quo under North Dakota's existing 1988 RMP.  The four new alternatives considered in the Final EIS— Alternatives B, B.1, C, and D—are fundamentally similar in their restrictive approach to coal, oil, and natural gas leasing.  BLM did not include any "middle ground" alternative between the No Action Alternative (Alternative A) and those more restrictive options.

53.   Alternative B prohibited all future federal coal leasing outside of a 4-mile area around existing coal mine permit boundaries, entirely foreclosing development of over 90% of all known federal coal interests in the State.  *See* **Exhibit B** at 2-2, 2-16.  Alternative B also directly closed 213,100 acres to fluid mineral leasing, characterizing vast amounts of mineral acreage as having "low development potential," *id.* at 2-2, 2-3, and imposed surface use stipulations that would substantially impede fluid mineral leasing even in the areas where it is not categorically prohibited, *id.* at 2-42 to 2-46.  Alternative B further imposed new exclusion and avoidance restrictions for granting of rights-of-way, which would prevent the construction of roads, transmission lines, and pipelines in those areas—applying exclusion restrictions to 61.5% of all federal acres and avoidance restrictions to 37%, leaving only 1.52% of federal acreage in the State (900 acres) open to effective mineral development.  *Id.* at 2-3.

54.   Alternative B.1 was essentially the same as Alternative B, but further tightened the prohibition on future federal coal leasing by designating all areas outside currently approved permit boundaries as unavailable for future coal leasing.  *See id.* at 2-2, 2-3.  This would have

prohibited 98.5% of the known federal coal interests in the State from development. *Id*. at 2-4.

55.    Alternative C included restrictions on future development that are functionally as restrictive as Alternative B.  Alternative C didn't formally close as much mineral acreage to future coal leasing, but closed precisely the mineral acreage that is likely to be developed during the life of the RMP—areas that are located in and around the Bakken Shale development in the northwest/west part of the State.  The only areas formally left open for future coal development under Alternative C were in parts of the State unlikely to have any actual demand for development during the life of the RMP.  *See* **Exhibit K** at 6 (N. Am. Coal Co. Comments).[6]  Alternative C pretended to offer more flexibility with regard to fluid mineral leasing by not formally closing certain federal mineral interests to future development, but that flexibility was an illusion, as it dramatically expanded surface use limitations, achieving the same result through a different means.  *Id.* at 2-7, 2-3, 2-43 to 2-44; *see also* **Exhibit J** at 9–10 (N.D. Petroleum Council Comments).  As with Alternative B, only 1.5% of all federal acres were left open to potential right-of-way authorization—with the remaining 98.5% made avoidance areas.  *See* **Exhibit B** at 2-7.

56.    Alternative D—the Alternative the BLM proposed selecting in the Final EIS—tracked closely with Alternative B, making only minor adjustments around the edges primarily relating to future fluid mineral leasing.  *See id*. at 2-7 (describing minor changes to liquid mineral stipulations related to wildlife habitat protection, allocations for non-energy leasable minerals, classifications of river segments for inclusion in the National Wild and Scenic River System, and other minor adjustments).  The prohibitions of future federal coal development were effectively the same as for Alternative B, prohibiting all future federal coal leasing outside of a 4-mile radius around existing coal mine permit boundaries.  *Id*.  And with respect to right-of-way restrictions, only 2%

---

[6] Exhibit K is the final exhibit in this Complaint. A list of all exhibits is included in Appendix 1.

of all federal acres were open to potential authorization, with 5% categorized as exclusion areas and 93% categorized as avoidance areas. *Id*. at 2-3, 2-39. This was almost identical to the available 1.5% of federal land left available in Alternatives B, B.1, and C.

57. In sum, all of the new alternatives considered by BLM in its Final EIS were designed to *dramatically* restrict the future development of federal mineral resources across the entire State of North Dakota. BLM's Final EIS considered no new alternative aimed at growing, even modestly, the development of federal mineral resources while also providing appropriate consideration of environmental and other resources. None of the new alternatives considered by BLM could reasonably be described as a middle-ground approach.

### D.    North Dakota's Objections to the Proposed RMP

58. At every step of the way, the State repeatedly raised significant concerns over BLM's proposed RMP amendments. In response to BLM's Draft RMP and Draft EIS, the State submitted extensive comments highlighting violations of FLPMA, MLA, inconsistencies with State policies, and a range of other concerns. *See* North Dakota Comments on the Draft RMP/EIS (May 22, 2023), attached as **Exhibit C**. BLM simply disregarded the majority of the State's comments.

59. Then, in response to BLM issuing a Proposed RMP and Final EIS, the State submitted a formal protest letter, pursuant to BLM's protest procedures. *See* North Dakota Protest to the Proposed RMP/Final EIS (Sept. 9, 2024) attached as **Exhibit D**; *see also* 43 C.F.R. § 1610.5-2.

60. The Governor of North Dakota also submitted a comprehensive review of the Proposed RMP and Final EIS, pursuant to BLM's administrative review process. *See* Governor's Consistency Review (Oct. 9, 2024), attached as **Exhibit E;** *see also* 43 C.F.R § 1610.3-2(e). The Governor explained the Proposed RMP was "NOT consistent with numerous State laws, policies, programs" and "inconsistent with federal laws, regulations, other federal programs, and the

Bureau's own management directions." *Id*. at 4. He requested multiple revisions to the Proposed RMP to address those flaws and cautioned BLM against selecting Alternative D.

61. BLM's State Director Germann responded to the Governor's consistency review letter and, while professing that "[y]our engagement, along with that of your staff, in this process is greatly appreciated," nonetheless categorically rejected <u>every single one</u> of the Governor's recommendations and declined to make any changes whatsoever to the Proposed RMP/Final EIS. *See* State Director Denial (Nov. 8, 2024), attached as **Exhibit G.**

62. Pursuant to BLM's administrative procedures, the Governor of North Dakota then appealed the State Director Denial to the Director of BLM, explaining the State Director's response was procedurally deficient and failed to meaningfully respond to the Governor's Consistency Review. *See* Governor's Consistency Appeal (Dec. 12, 2024), attached as E**xhibit F**. That appeal included a request that the BLM Director recuse herself from involvement with the RMP because she had announced that she would be leaving BLM to work at an organization that had previously intervened in litigation to defend BLM policies challenged by the State of North Dakota.

63. Then, in the final weeks of the Biden Administration, the Department of the Interior sent a four-page response to the Governor's Consistency Appeal (signed by Dep't of Interior Principal Deputy Assistant Secretary of Land and Minerals Management Steven H. Feldgus) summarily denying the Governor's Appeal and again declining to meaningfully address or accept the Governor's Consistency Review recommendations. *See* Appeal Denial (Jan. 7, 2025), attached as **Exhibit H**. The Appeal Denial does not reflect meaningful consideration as to whether the Governor's recommendations "provide for a reasonable balance between the national interest and the State's interest," nor does the Appeal Denial clearly communicate the "reasons for his[] determination to … reject such Governor's recommendations." *Contra* 43 C.F.R. § 1610.3-2(e).

### E.    BLM's Finalization of the Amended RMP

64.    After summarily dismissing the many concerns raised in North Dakota's Comments, North Dakota's Protest, the Governor's Consistency Review, and the Governor's Appeal, BLM finalized its amendments to North Dakota's RMP on January 8, 2025, and published them in the Federal Register on January 15. **Exhibit A**. In a letter accompanying that Final Rule, BLM State Director Germann had the audacity to state it was the product of "collaboration," despite every single protest and concern being rejected. *See* **Exhibit A** (Cover Letter from S. Germann).

65.    The Amended RMP applies to all current and future management decisions on BLM-administered lands and mineral estates in North Dakota, including new leases, terminated but reinstated leases, and extensions of existing authorizations and permits. **Exhibit A** at 1-3 to 1-4. It also applies to "split estates" including either federal surface or federal mineral interests that are part of communitization agreements with State or private owners. **Exhibit A** at 2-4.

66.    The Amended RMP reflects Alternative D from the Final EIS. For oil and gas leasing, the Amended RMP directly bans the future leasing of approximately 44% of all known federal fluid minerals (*e.g.*, oil and gas) in the State. **Exhibit A** at 2-44. But the impact of that ban extends far beyond just the federal mineral interests. It will affect millions of acres of State and private mineral interests in North Dakota that are communitized with relatively small federal interests and can only be developed in cooperation with those federal minerals. Withdrawing approximately 44% of all federal minerals from future leasing will effectively bar the development of a significant volume of State- and privately-owned mineral interests across the State.

67.    Moreover, even on acreage where the future leasing of federally owned oil and gas interests in North Dakota remains theoretically possible, BLM imposed substantial surface use restrictions that will constrain any effective resource development—including subjecting approximately 130,000 acres to no surface occupancy stipulations (**Exhibit A** at 2-45); 213,000

acres to controlled surface use stipulations (**Exhibit A** at 2-46), and another 183,000 acres to timing limitation stipulations (**Exhibit A** at 2-46).[7]

68.   The prospects for future coal development in North Dakota are even bleaker.   By prohibiting all future development outside a 4-mile radius from current leases, the Amended RMP prohibits the development of more than 90% of the known federal coal acreage in North Dakota, barring 1,096,400 acres from consideration for future leasing.   **Exhibit A** at 2-50, F-2.   Because of stabilization requirements, as well as the inefficiencies of conducting mining operations around scattered islands of federally owned coal interests, the impact of this ban on the development of State- and privately-owned coal interests across the State will be extremely substantial.

69.   The Amended RMP also imposes additional restrictions in greater sage-grouse habitat management areas.   For example, the Amended RMP prohibits surface occupancy for oil and gas leasing and development operations in priority habitat management areas, **Exhibit A** at 2-28, even for split estates where the federal government owns the mineral estate, but the surface is State- or privately-owned.   **Exhibit A** at 2-50.   And for coal leasing, the Amended RMP similarly prohibits any surface disturbances within priority habitat management areas.   **Exhibit A** at 2-51.

70.   Throughout the Amended RMP, BLM repeatedly describes conservation as a "use" for federal lands and resources in North Dakota.   *See, e.g.*, **Exhibit A** at 2-75 (listing the uses of federal resources under the Amended RMP to include "scientific use, conservation use, traditional use, public use, and experimental use").   Without any statutory basis, it conserves "for future use"

---

[7] "No Surface Occupancy" is a stipulation that prohibits surface-disturbing activities on a specified area of land. "Controlled Surface Use" is a stipulation that allows surface-disturbing activities but imposes specific conditions or restrictions to mitigate impacts on certain resources.  "Timing Limitation" is a stipulation that restricts surface-disturbing activities during certain periods of the year to protect wildlife, habitat, or other sensitive resources. *See* Glossary of Common BLM terms available at https://eplanning.blm.gov/public_projects/lup/22652/34861/36285/1.2_Glossary_of_Common_BLM_Terms.pdf (accessed Feb. 17, 2024).

property that has "research potential that surpasses the current state of the art, singular historic importance, cultural importance, architectural interest, or comparable reasons." *Id*. at 2-36 to 2-37. "A cultural property included in this category is deemed worthy of segregation from all other land or resource uses, including cultural resource uses that would threaten the maintenance of its present condition or setting, as pertinent, and would remain in this use category until specified provisions are met in the future." *Id.* at 2-37.

## INJURY TO NORTH DAKOTA

71.   North Dakota is ranked 3rd among all States in the production of crude oil and ninth among all States in the production of natural gas. *See* U.S. Energy Info. Admin., North Dakota State Profile, https://www.eia.gov/state/?sid=ND (accessed Feb. 23, 2025). The State produces approximately 400 million barrels of oil per year and 1.2 trillion cubic feet of natural gas per year.

72.   The State is also ranked 7th in the production of coal, with an average production of approximately 27.5 million tons per year. The Final EIS acknowledges that "North Dakota contains the single largest deposit of lignite known in the world. The industry contributes substantially to North Dakota's economy, resulting in $5.75 billion in gross business volume, 12,000 jobs (direct and secondary), and $104 million in local and state government revenues." **Exhibit B**, at 3-245 to 3-246.

73.   Those industries employ tens of thousands of people in communities large and small across the State, and North Dakota obtains a large share of its State revenues—billions of dollars annually—directly and indirectly from the development of those natural resources.

I.   **Economic Injuries**

74.   Implementation of the Amended RMP will result in severe adverse economic impacts to the State, in the form of direct losses of State revenue from resource extraction taxes and royalties, and indirect losses in the form of lost jobs, a reduced tax base, and increased energy costs.

75.   For oil and gas development alone, the anticipated direct loss in State revenue from

royalties and excise taxes is estimated to be at least $34 million per year.  The impact from this loss is expected to last through the entire 30-year development life of the Bakken.  **Exhibit C** (North Dakota Comments) at 3.  The Amended RMP's restrictions on coal leasing will similarly cost the State millions of dollars annually in lost revenues.

76.    And in addition to direct revenue losses, the Amended RMP will affect the State by causing lost jobs, increased energy costs, and infrastructure development delays.  *See, e.g., id*. at 26-27 (discussing impact on electricity costs); *id.* at 19 (discussing impact on State's ability to fund education); *id.* at 28 (discussing how critical water infrastructure projects will be impaired).

## II. Environmental and NEPA Procedural Injuries

77.    The State also is injured by BLM's failure to comply with the requirements of NEPA.  "'Injury under NEPA occurs when an agency fails to comply with the statute …  The injury-in-fact is increased risk of environmental harm stemming from the agency's allegedly uninformed decision-making.'" *Missouri Coal. for Env't v. FERC*, 544 F.3d 955, 957 (8th Cir. 2008) (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006)).

78.    Despite the importance of mineral development to the State and the fact that the previous RMP has allowed for the reasonable and efficient development of public lands for decades, the Amended RMP, based upon the faulty and inadequate NEPA analysis, abruptly reverses course and significantly restricts mineral development across the State, thereby causing significant harm to the State's finances and economy.  But in so doing, BLM failed to adequately consider the environmental impacts that the Amended RMP would have on the State.

79.    The Final EIS did not consider reasonable alternatives to the plan, and did not adequately review the reasonably foreseeable direct, indirect, and cumulative impacts associated with the Proposed RMP Alternatives.  *Cf. Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1126 (8th Cir. 1999) (injury for NEPA claim where the plaintiffs alleged "the Final EIS fails

to consider adequately the economic impact on local economies and the Final EIS is based on flawed data or an incomplete analysis of alternative plans").

80.   The Final EIS also failed to meaningfully analyze the harm to North Dakota's environment and contains facially obvious gaps in logic that demonstrate BLM's failure to consider the impacts of making resource development less efficient.  For example, the Final EIS's assessment of Alternative D was predicated on an assumption that prohibiting all future development of federal coal interests would not cause a decrease in net coal extraction because any federal coal interests blocked from extraction will be replaced with State- or privately-owned interests. **Exhibit B** at 3-13.  However, it was explained to BLM that keeping coal extraction levels the same while forcing operators to mine around the checkerboard of federal mineral interests will obviously decrease the efficiency of coal mining operations, and thereby increase fugitive dust, fuel usage, and other emissions.  **Exhibit C** at 22.  Categorically excluding federal interests will also slow reclamation, reseeding, and restoration of mined lands across the State.  *Id.*  Those changes will foreseeably, and negatively, impact North Dakota's air quality and landscape, but the Final EIS failed to analyze that impact in any meaningful way.

## III.   Sovereign Injuries

81.   The MLA recognizes States' sovereign authority over their natural resources and directs that "[n]othing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have."  30 U.S.C. § 189.

82.   FLPMA further recognizes that "the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands," 43 U.S.C. § 1701(a)(12), and that "[t]he policies of this Act shall … be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law," *id.* at § 1701(b).

83.    The Amended RMP unlawfully interferes with North Dakota's sovereign authorities to manage, protect, develop and regulate natural resources with the State by leveraging and abusing the presence of scattered federal mineral interests to block the development of State- and privately-owned mineral interests and lands across the State.  The Amended RMP thus interferes with North Dakota's authority to regulate, manage, and develop its natural resources, including mineral interests owned by North Dakota and private parties. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) ("States have a constitutional right to maintain their "traditional and primary power over land and water use.").

## NORTH DAKOTA'S CLAIMS ARE RIPE FOR REVIEW

### I.  North Dakota's NEPA Claims Are Ripe

84.    A claim under NEPA is ripe when the agency takes final action with respect to its NEPA obligations, such as by issuing a final EIS.  *U.S. Army Corps of Eng'rs*, 446 F.3d at 815-16.

85.    "[A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Kern*, 284 F.3d at 1070-71 (NEPA claim is ripe when the final EIS issued) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

86.    The Final EIS issued by BLM in support of the Amended RMP was the final BLM action in its NEPA review process, and thus ripe for legal challenge.

### II.    North Dakota's Other Challenges to the Amended RMP Are Ripe

87.    Courts consider three factors for whether an action is ripe for review: "1) whether delayed review would cause hardship to the plaintiffs;  2) whether judicial intervention would inappropriately interfere with further administrative action; and 3) whether the courts would benefit from further factual development of the issues presented." *Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1192 (10th Cir. 2008).  The Amended RMP satisfies all three factors.

88.     First, and perhaps most importantly, the Amended RMP is a final agency action, so judicial review at this time would not interfere with further administrative activities.

89.     Second, delayed review would cause hardship to the State.  The Amended RMP will impact ongoing development projects because BLM will need to conform current project approval and permit terms and conditions to the Amended RMP, including where project proponents seek extensions.  **Exhibit A** at 1-4.  Additionally, as BLM acknowledges, "[p]rojects for which site-specific decisions have not yet been signed, but for which preparation of NEPA documents began before the [Record of Decision's] effective date, may also require modification to conform to the RMP." **Exhibit A** at 1-4. Moreover, by withdrawing vast amounts of federal land and interests from future development, the Amended RMP immediately impacts the value of State- and privately-owned mineral interests that are pooled with federal minerals under existing communitization agreements, or that otherwise depend on co-development with federal interests.

90.     And third, further factual developments aren't necessary for resolving this dispute. BLM's promulgation of the Amended RMP (and the flawed Final EIS that underlies it) violated multiple federal statutes, and resolving that issue is not dependent on factual developments.

## CLAIMS FOR RELIEF

### COUNT 1
### Violation of NEPA and the APA
### *Failure to Consider a Reasonable Range of Alternatives*

91.     Plaintiff reasserts and incorporates by reference all preceding paragraphs.

92.     A NEPA analysis must include "every reasonable alternative" so as to allow for an informed choice from a full range of options.  *LaCounte,* 939 F.3d at 1038.  The alternatives analysis is the "heart" of a NEPA document, and an EIS must "rigorously explore and objectively evaluate all reasonable alternatives."  *Oregon Nat. Desert Ass'n,* 625 F.3d at 1100 (quoting 40 C.F.R. § 1502.14); NEPA Handbook at § 9.2.7.1   Failing to consider viable alternatives risks

biasing the agency's decision-making. Consequently, the "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Dombeck*, 164 F.3d at 1126.

93. The Final EIS relied upon by BLM for the Amended RMP only considered a no-action alternative along with four alternatives that are identical in the sense that they are all tailored to *severely* restrict the future development of federal mineral interests across the State.

94. Indeed, the only other alternatives that BLM tentatively identified in its Final EIS, but then eliminated from any detailed analysis (i.e., alternatives that it considered considering), would have completely prohibited the leasing of federally owned coal and even more severally restricted fluid mineral leasing throughout the State. **Exhibit B** at 2-7 to 2-8. BLM did not consider, even in a cursory manner, any middle-ground alternatives or alternatives that would have allowed for more efficiently developing federal mineral interests across the State.

95. BLM thus failed to "rigorously explore and objectively evaluate" all reasonable alternatives for amending North Dakota's RMP. This failure means that BLM's decision-making process in issuing the Final EIS was arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA in violation of 5 U.S.C. § 706(2)(A).

## COUNT 2
### Violation of NEPA and the APA
#### *Failure to Take a "Hard Look" at the Impacts of Closing Federal Coal Development*

96. Plaintiff reasserts and incorporates by reference all preceding paragraphs.

97. NEPA requires federal agencies to take a "hard look" at the consequences of a proposed major federal action. *Robertson*, 490 U.S. at 350. And if an agency fails to make that "hard look," it runs afoul of the APA by issuing an act that is "arbitrary, capricious, an abuse of discretion," and "not in accordance with law." 5 U.S.C. § 706(2).

98. The Final EIS fails to take a "hard look" at the direct, indirect, and cumulative environmental impacts caused by categorically prohibiting all future development of federally-

owned coal interests in the State outside of a four-mile ring around current leases, while simultaneously assuming net coal extraction will not decrease. Contrary to the perfunctory conclusions reached by BLM in the Final EIS, foreclosing nearly all future federal coal leasing under the assumptions that are employed in the Final EIS would undoubtedly have *negative* environmental impacts in the State. The Final EIS fails to account for that reality.

99. BLM assumes that total coal production will be identical across all alternatives, including no-action Alternative A. *See* **Exhibit B** at 3-18 ("the total (federal plus nonfederal) coal production through 2040 is the same under all alternatives"). And BLM's Final EIS rests upon the assumption that "the shortfall in federal coal production under [all of the considered Alternatives] would be made up by an increase in nonfederal coal production." **Exhibit B** at 3-18.

100. Commenters made EPA aware of the intuitive fact that holding coal production constant while forcing operators to mine around the checkerboard federal interests in North Dakota would greatly *decrease* the efficiency of coal mining operations, and thereby greatly *increase* overall fugitive dust, fuel usage, and other emissions that cause environmental harm. *See* **Exhibit C**, at 22-23. It would also significantly impair landscape reclamation efforts. *See id.* at 29–30.

101. Nonetheless, the Final EIS takes only a cursory glance at those impacts, failing to grapple with them in any meaningful way. *See* **Exhibit B** at 3-33. And BLM's Air Quality Technical Support Document, which contains the results of BLM's modeling and air quality assessment, also fails to provide any discussion of these increased impacts. *See* **Exhibit I** at 127-37.

102. The Final EIS only attempted to address the harms foreseeably caused by requiring nearly all future coal mining in the State to be done around islands of federal mineral interests in two cursory places, both of which fall far short of the "hard look" required by NEPA.

103. First, the Final EIS described the issue with two brief sentences, regurgitating Plaintiff's

comments without any attempt to analyze this issue. *See* **Exhibit B** at 3-33 ("Due to the checkerboard pattern created from federal coal avoidance under Alternative B, the potential additional surface disturbance and coal haul distances will cause additional cumulative air impacts. Potential additional impacts include fugitive dust, increases diesel usage, and increased cumulative GHG emissions."). But noting that commenters made the agency aware of an issue is not the same thing as analyzing it. *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 537 (8th Cir. 2003) (stating that an agency preparing a final EIS has a "duty to *assess*, consider, and respond to all comments") (emphasis added); *see also* NEPA Handbook at § 6.9.2.2 (agency must meaningfully engage with substantive comments).

104. And second, BLM waved away the environmental impacts of forcing a decrease in mining efficiency by summarily stating the environmental impacts would be insignificant. *See* **Exhibit B** at 3-33 ("Additionally, restriction of federal coal could potentially result in additional emissions due to mine operators having to bypass federal coal tracts to reach nonfederal coal reserves. However, this increase in mining emissions due to bypass is expected to have relatively small impact on the total coal emissions as downstream combustion emissions comprise the majority of the total emissions from coal."). That conclusory, two-sentence soundbite is the grand total of the Final EIS's assessment of the issue and the impact it will have on the environment. And it is insufficient for satisfying BLM's obligations under NEPA here. *E.g., Kern*, 284 F.3d at 1073-74 (two sentence conclusion in an EIS was "obviously inadequate").

105. On the other side of the ledger, the Final EIS summarily claims that closing over 90 percent of all known federal coal interests in the State to future development would reduce potential impacts on general and sensitive populations. *See* **Exhibit B** at 3-255 to 3-256. That is the only environmental benefit the Final EIS claims would result from foreclosing nearly all

federal coal interests in the State from future development.  However, BLM offers no analysis or explanation for how such potentially adverse impacts on "sensitive populations" would be benefitted by a prohibition on future federal mineral leasing when it also assumes that the adjacent non-federal coal interests will be mined to replace the foregone federal minerals.

106. In short, BLM's Final EIS failed to take a "hard look" at the direct, indirect and cumulative effects of foreclosing the future development of nearly all federal coal interests in the State—particularly when paired with its assumption that doing so will not result in a net decrease in coal production.  This failure to undertake a meaningful and comprehensive assessment of the agency's proposed actions renders the Final EIS arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA in violation of 5 U.S.C. § 706(2)(A).

### COUNT 3
### Violation of NEPA and the APA
### *Failure to Take a "Hard Look" at the Impacts of Right-of-Way Restrictions*

107. Plaintiff reasserts and incorporates by reference all preceding paragraphs.

108. NEPA requires federal agencies, including BLM, to take a "hard look" at the consequences of a proposed major federal action.  *Robertson*, 490 U.S. at 350.  And if an agency fails to make that "hard look," it runs afoul of the APA by issuing an act that is "arbitrary, capricious, an abuse of discretion," and "not in accordance with law."  5 U.S.C. § 706(2).

109. The Final EIS does not analyze the environmental impacts of its new rights-of-way restrictions, simply assumes those restrictions will result in environmental benefits, and does not analyze the environmental and economic consequences of those restrictions.

110. Several commenters raised these concerns, pointing out that modern pipeline construction can result in very little surface disturbance, and restricting right-of-way access to well sites will result in environmental harms.  *E.g.*, **Exhibit J** at 28 (N.D. Petroleum Council Comments).  Nonetheless, the Final EIS fails to analyze the environmental issues caused by its sweeping new

right-of-way restrictions. For example, the Final EIS does not assess whether, and to what extent, the restrictions will strand new and existing production wells. It doesn't assess whether those restrictions will foreseeably result in the waste of natural gas. And it doesn't assess whether those restrictions will cause a decrease in air quality by causing operators increase the amount of gas that is vented or flared due to an inability to connect production wells to pipelines or to otherwise quickly transport the produced oil and gas away from well sites.

111. The Final EIS fails to ask and analyze those questions, let alone offer an answer for them. *Cf. Mid States Coal. for Progress*, 345 F.3d at 537 (agency preparing a final EIS has a "duty to *assess*, consider, and respond to all comments") (emphasis added).

112. In that aspect again, the Final EIS failed to undertake the "hard look" that NEPA requires. *See Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) (requiring quantitative analysis of air quality changes); *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737–38 (9th Cir. 2020). As a result, the Final EIS is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA in violation of 5 U.S.C. § 706(2)(A).

**COUNT 4**
**Violation of NEPA and the APA**
***Failure to Take a "Hard Look" at the Impacts of Surface Use Stipulations***

113. Plaintiff reasserts and incorporates by reference all preceding paragraphs.

114. NEPA requires federal agencies, including BLM, to take a "hard look" at the consequences of a proposed major federal action. *Robertson*, 490 U.S. at 350. And if an agency fails to make that "hard look," it runs afoul of the APA by issuing an act that is "arbitrary, capricious, an abuse of discretion," and "not in accordance with law." 5 U.S.C. § 706(2).

115. The Final EIS lacks a thorough or meaningful analysis of the environmental benefits and impacts associated with the No Surface Occupancy and Conditional Surface Use stipulations for oil and gas development, both of which are more restrictive than necessary.

116. Throughout the Final EIS, BLM provides conclusory statements that those new and restrictive stipulations will protect the environment, without analyzing or explaining how much protection the new restrictions will offer, whether another method would achieve similar results while allowing greater development of federal (and state and private) minerals, or even assessing whether those new restrictions would be effective at achieving their goals at all.

117. For instance, BLM claims that all alternatives—including the status quo without the new stipulations—would achieve compliance with air quality standards, and that development under all alternatives would not cause exceedances of air quality standards. **Exhibit B** at 3-9 ("For all alternatives analyzed, compliance with the air quality standards is expected to continue.  New federal oil, gas, and coal mining emissions in North Dakota attributable to BLM authorized activities would not lead to exceedances in the analysis area, including at Class I areas and Indian reservations.").  Nonetheless, when describing a No Surface Occupancy restriction, the Final EIS simply states the restriction is needed to "to protect the air quality and air quality values." *Id.* at B-5.  The Final EIS provides no analysis for how this limitation will protect air quality, particularly given that air quality standards would be protected even under the status quo.

118. As another example, the Final EIS claims that oil and gas development will occur on a certain 72 acres of BLM-administered surface estate "with not much impact expected on soil resources under all alternatives"—including under the status quo. **Exhibit B** at 3-48.  Nonetheless, BLM imposes a new Conditional Surface Use stipulation that requires a reclamation plan before surface disturbance on that acreage. *Id.* at 3-56, B-30.  The Final EIS includes three sentences asserting that mandating that stipulation will "protect sensitive soils." *Id.* at 3-56.  But those sentences simply beg the question, presuppose that there is some sort of benefit from the stipulations, and then mandate a reclamation plan for that acreage *unless* the operator can

demonstrate that the proposed action will not disturb sensitive soils. *Id.* at B-30. In other words, BLM simply assumes that there will benefits from a blanket restriction and then shifts the burden of NEPA's "hard look" to the operator at the time of mineral development.

119. The Final EIS also fails to consider any alternatives that do not impose the No Surface Occupancy and Conditional Surface Use stipulations on future oil and gas leases.

120. Having failed to explain how the No Surface Occupancy and Conditional Surface Use stipulations achieve any intended benefit, and having failed to analyze any alternatives that would achieve those same (unexamined) benefits, the Final EIS also fails to analyze the adverse impacts that imposition of those restrictive stipulations will have. Commenters put BLM on notice that imposing those stipulations would have adverse environmental and economic consequences. *E.g.*, **Exhibit J** at 16–17 (N.D. Petroleum Council Comments) (explaining the stipulations would reduce efficiency, strand lands from development, and prevent a diversity of resource uses).

121. Rather than offering any meaningful analysis of the environmental and economic impacts of imposing those stipulations on all future oil and gas leases, the Final EIS simply brushes aside the concern by stating (counter-factually) that federal minerals can be prohibited from development without impacting the development of State- and privately-owned minerals. *E.g.*, **Exhibit B** at 3-203 ("BLM-administered surface parcels in the planning area … [are] easy to avoid."). But conclusory statements—especially conclusory statements based on glaring factual inaccuracies—do not replace the need to analyze the issue.

122. The Final EIS failed to take a "hard look" at the direct, indirect and cumulative effects of imposing No Surface Occupancy and Conditional Surface Use stipulations on all future oil and gas leases. In this way again, the Final EIS is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA in violation of 5 U.S.C. § 706(2)(A).

**COUNT 5**
**Violation of FLPMA and the APA**
*Failure to Comply with the Statutory Multiple Use Framework*

123.  Plaintiff reasserts and incorporates by reference all preceding paragraphs.

124. FLPMA directs BLM to manage federal lands using the principles of "multiple use and sustained yield," 43 U.S.C. § 1712(c)(1), which means "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people," *id.* § 1702(c).   Under FLPMA, the "term 'principal or major uses' includes, *and is limited to*, [1] domestic livestock grazing, [2] fish and wildlife development and utilization, [3] mineral exploration and production, [4] rights-of-way, [5] outdoor recreation, and [6] timber production."  *Id.* § 1702(l) (emphasis and brackets added).

125. FLPMA expressly directs that BLM "shall" "use" federal resources to meet the present and future needs of the public.  43 U.S.C. § 1712(c)(1).

126. Here, the Amended RMP directly bans future leasing of 213,100 acres of federal fluid minerals (e.g., oil and gas) and 1,037,800 acres of federal coal.  **Exhibit A** at 2-44, 2-50. Moreover, because of the need to communitize or otherwise co-develop federal mineral interests with State- and privately-owned minerals, entirely withdrawing more than a million acres of federal minerals from all future leasing will necessarily also prevent the development of an even greater amount of State- and privately-owned mineral interests.

127. The Amended RMP also unlawfully elevates "conservation" over the development and use of mineral resources.  *E.g.,* **Exhibit A** at 2-75 (listing the uses of federal resources under the RMP to include "scientific use, conservation use, traditional use, public use, and experimental use").  However, FLPMA requires the "use" of natural resources.  "Conservation," by its very nature, is an express non-use of the resources.   BLM lacks authority to engage in regulatory semantics and transform the non-use of resources into a "conservation use" of them.  BLM is not

the National Park Service and has no statutory basis to pretend that it is.  The Amended RMP's

purported elevation of "conservation" as a use exceeds BLM's statutory authority.

128. The Amended RMP thus violates FLPMA, exceeds BLM's statutory authority by

disregarding and contravening the statutory multiple use framework, and it is not in accordance

with the law in violation of 5 U.S.C. § 706(2)(A).

### COUNT 6
### Violation of FLPMA and the APA
### *Failure to Comply with Requirements for Withdrawing Large Tracts from Development*

129.  Plaintiff reasserts and incorporates by reference all preceding paragraphs.

130.  FLPMA prescribes a specific process for any "withdrawal aggregating five thousand

acres or more."  43 U.S.C. §1714(c)(1).  After 1976, such withdrawals cannot be for "more than

twenty years," and require the Secretary of the Interior to "notify both Houses of Congress of such

a withdrawal no later than its effective date."  *Id.*

131.  FLPMA also imposes restrictions on effective withdrawals of lands in RMPs, including

any "management decision or action pursuant to a management decision that excludes (that is,

totally eliminates) one or more of the principal or major uses for two or more years with respect

to a tract of land of one hundred thousand acres or more."  43 U.S.C. § 1712(e)(2).  Such actions

"shall be reported by the Secretary to the House of Representatives and the Senate."  *Id.*

132.  A "withdrawal" of land from development means "withholding an area of Federal land

from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose

of limiting activities under those laws in order to maintain other public values in the area or

reserving the area for a particular public purpose or program; or transferring jurisdiction over an

area of Federal land … to another department, bureau or agency."  43 U.S.C. § 1702(j).

133.  In a separate lawsuit, this court has already enjoined BLM "from *de facto* withdrawing

lands in North Dakota identified for oil and gas development in their respective RMPs without

following the statutory procedures for … congressional notice.  *North Dakota v. U.S. Dep't of Interior*, No. 1:21-cv-00148, Dkt. 98, ¶147 (D.N.D. Mar. 27, 2023).

134. Nonetheless, the Amended RMP directly closes 213,000 acres of known oil and gas deposits to future leasing.  **Exhibit A** at 2-44.   This area includes parcels upon which 148 Expressions of Interest were filed between 2007 and 2018.   **Exhibit J** at 19 (N.D. Petroleum Council Comments).  Closing this acreage to future leasing without processing those parcels and offering them at auction constitutes an unlawful withdrawal of thousands of acres.

135. The Amended RMP also creates an effective withdrawal of acreage from coal leasing by prohibiting all future federal coal leasing outside of a 4-mile radius around the existing coal mine permit boundaries.  **Exhibit B** at 2-11.  This will effectively withdraw at least 1,096,400 acres of known coal deposits from future development.

136. Upon information and belief, the Secretary of the Interior has not followed the required statutory procedures nor provided Congress with the notices of withdrawal required under 43 U.S.C. § 1712(e)(2) and 43 U.S.C. §1714(c)(1).

137. The Amended RMP thus violates FLPMA, exceeds BLM's statutory authority by disregarding the requirements for withdrawing large tracts from development, and is not in accordance with the law in violation of 5 U.S.C. § 706(2)(A).

### COUNT 7
### Violation of the MLA, the Energy Policy Act of 2005, and the APA

138. Plaintiff reasserts and incorporates by reference all preceding paragraphs.

139. The purpose of the Mineral Leasing Act is "*to provide incentives* to explore new, unproven oil and gas areas" while also assuring "adequate compensation to the government for leasing in producing areas" through the competitive bidding process.  *Arkla Expl. Co. v. Tex. Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984) (emphasis added)*;see also* Mineral Leasing Act

of 1920, 66 Cong. 2d Sess., Ch. 85, 41 Stat. 437 (codified as amended 30 U.S.C. § 181 et seq.) (specifying in its subtitle that the MLA was enacted "[t]o promote the mining of coal, phosphate, oil, oil shale, gas, and sodium in the public domain").

140. The Mineral Leasing Act is explicit in operationalizing these goals. For coal, the Secretary of the Interior, "shall, in his discretion, upon the request of any qualified applicant or on his own motion, from time to time, offer such lands for leasing and shall award leases thereon by competitive bidding." 30 U.S.C. § 201(a)(1). Similarly, for oil and natural gas, the MLA provides substantial authority for Secretary to allow for communitization of that oil and natural gas when in "the public interest." 30 U.S.C. § 226(m). And because the "public does not benefit from resources that remain undeveloped, [BLM] must administer the Act so as to provide some incentive for development." *California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961).

141. Similarly, the Energy Policy Act of 2005 directs that lease stipulations for mineral development on federal land must be "only as restrictive as necessary to protect the resource for which the stipulations are applied." 42 U.S.C. § 15922(b)(3)(C).

142. Nonetheless, the Amended RMP directly and indirectly reflects the prior Administration's position that the public interest would instead be better served by keeping America's mineral wealth in the ground. The Amended RMP directly and indirectly hampers the leasing of minerals including coal, oil, and natural gas. For coal, the Amended RMP prohibits all future development outside a 4-mile radius for current operations, therefore blocking off more than 90% of the known federal coal acreage in North Dakota. **Exhibit A** at 2-50, F-2. And for oil and gas, the Amended RMP directly bans the future leasing of approximately 44% of all known federal fluid minerals, closing 213,000 acres of known oil and gas deposits to future leasing. *Id.* at 2-44.

143. That is contrary to the MLA's letter, and contrary to the law. "[A] government official

cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Because Congress has already specified, in statute, that the national interest is served by the responsible development of America's natural resources, BLM cannot use the Amended RMP to prohibit and hinder the leasing of minerals that it has an obligation to *incentivize* the development of under the MLA and the Energy Policy Act of 2005.

144. Because the Amended RMP contradicts BLM's obligation to *incentivize* the responsible development of federally owned natural resources, the Amended RMP exceeds and is contrary to BLM's statutory authority under the MLA and the Energy Policy Act of 2005, and consequently is not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

**COUNT 8**
**Arbitrary & Capricious Agency Action in Violation of the APA**
*Failure to Adequately Consider Reliance Interests*

145. Plaintiff reasserts and incorporates by reference all preceding paragraphs.

146. BLM has violated the APA by failing to consider the State's significant reliance interests under the 1988 RMP before adopting the Amended RMP.

147. The 1988 RMP has been the cornerstone of cooperative and responsible land and resource management in North Dakota for decades. The 1988 RMP provided a balanced approach that guided resource planning decisions through these three decades, including managing the Bakken Shale boom and development of coal resources in the State.

148. The State and its agencies have structured their regulatory framework around the 1988 RMP's framework for the use of federal resources. The State's comprehensive regulatory framework to manage land use, mineral resources, water rights, and environmental protection have relied on the 1988 RMP, reasonably trusting that the federal government would continue to act as a rational actor in the responsible development of public resources. Private stakeholders in the North Dakota have likewise structured their economic activities, significant investments, and long-

term operational plans in reliance on the federal government's reasoned and rational approach to resource management under the 1988 RMP.

149. In its comment letter on the Proposed EIS and Draft RMP, the State raised these serious reliance concerns with BLM. *See* **Exhibit C** at 10. The State's Protest Letter to the Final EIS and Proposed RMP similarly raised the same concerns. *See* **Exhibit D** at 11.

150. BLM failed to even give lip-service to these significant reliance interests. Nowhere in the Amended RMP is there any meaningful discussion—even in cursory fashion—of the serious reliance interests that would be impacted by BLM's sharp change in position.

151. The Supreme Court has made clear that "when an agency changes course," it must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dept. of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 31 (2020) (cleaned up) (citing *Encino Motorcars v. Navarro*, 579 U.S. 211, 221 (2016)).

152. By failing to consider those significant reliance interests before making a sharp and dramatic change that profoundly affects the future development of mineral resources throughout the entire State (not only federally-owned minerals, but State- and privately-owned minerals as well), the Amended RMP is arbitrary, capricious, and an abuse of discretion of the agency's discretion under 5 U.S.C. § 706(2)(A).

## COUNT 9
### Arbitrary & Capricious Agency Action in Violation of the APA and FLPMA
#### Failure to Adequately Respond to State Objections

153. Plaintiff reasserts and incorporates by reference all preceding paragraphs.

154. FLPMA requires the Secretary of the Interior to "keep apprised" of all State, local, and tribal land use plans, to "assure that consideration is given" to those plans, to "provide for meaningful public involvement" of State officials, and to "resolv[e]" inconsistencies between federal and non-federal land management plans. 43 U.S.C. § 1712(c)(9); 43 C.F.R. § 1610.3-2(e).

155.  Throughout the process of the Amended RMP's development, the State of North Dakota was extremely involved in providing BLM with comments and concerns with the proposed changes, not only as to the legality of the changes, but also the adverse impacts they would have within the State.  *See* **Exhibit C** (North Dakota Comments on the Draft RMP/EIS); **Exhibit D**. (North Dakota Protest to the Proposed RMP/Final EIS).  Those comments included the collected concerns and input of multiple different State agencies—including the Industrial Commission, the Department of Trust Lands, the Public Service Commission, the Department of Water Resources, the Department of Environmental Quality, and the Department of Mineral Resources—all acutely aware of, and impacted by, the Amended RMP's changes.

156.  Many of those issues were also addressed at length in the Governor's Consistency Review, which identified *twenty* inconsistencies with State and federal law created by the Amended RMP—seven with State law and thirteen with federal law.  *See generally* **Exhibit E** (Governor's Consistency Review); **Exhibit F** (Governor's Consistency Appeal).

157.  The seven inconsistencies with State law identified in the Governor's Consistency Review included: (1) Interfering with the North Dakota Constitution's policy of supporting public services with funds from federal mineral development; (2) Inconsistencies with North Dakota's State Trust Lands ownership; (3) Inconsistencies with North Dakota energy policy; (4) Inconsistencies with the North Dakota Department of Environmental Quality's primacy to implemental the Clean Air Act, the Clean Water Act, the Safe Drinking Water Act, and the Resource Conservation and Recovery Act; (5) Interfering with state law protections of paleontological specimens; (6) Interfering with the North Dakota Public Service Commission's primary authority of managing of coal operations and abandoned mines; and (7) Interfering with North Dakota's Interstate Mining Compact Statute.  **Exhibit E** at 4-15.

158. The thirteen inconsistencies with federal law identified in the Governor's Consistency Review included: (1) Inconsistencies with FLMPA by regulating activities on non-federal lands and mineral withdrawal; (2) Inconsistencies with FLMPA's land use planning regulations; (3) Inconsistencies with the MLA's command to promote the development of domestic mineral resources; (4) Interference with sovereign State and local functions under the MLA; (5) Inconsistencies with existing Communitization Agreements; (6) Inconsistencies with Department of the Interior regulations on regional cooperation; (7) Inconsistencies with coal leasing consultation regulations; (8) Inconsistencies with BLM's coal screening regulations; (9) Inconsistencies with federal Minerals Policy as expressed by BLM's own policy; (10) Inconsistencies with BLM's own Abandoned Mine Land policies; (11) Inconsistencies with BLM's own strategic plan; (12) Inconsistencies with federal initiatives supported by the Department of Energy; and (13) Inconsistencies with NEPA's requirements to take a hard look at the impacts that the Amended RMP would have in North Dakota.  **Exhibit E** at 15-36.

159. But instead of affording the State any degree of "meaningful [] involvement" (43 U.S.C. § 1712(c)(9)), addressing those many concerns, and then using the State's concerns to adjust the rule as part of a process of reasoned decisionmaking, BLM effectively ignored the State.  Rather than meaningfully responding to the State's myriad concerns, BLM simply asserted that "BLM thoroughly review the Governor's [letter identifying inconsistencies] and did not find any specific inconsistency issues."  **Exhibit A** at 1-6 to 1-7; *see also* **Exhibit H** (Appeal Denial) (4-page letter rejecting everything in the Governor's Consistency Appeal and stating that BLM "carefully review[ed] and consider[ed] applicable State, local, and other Federal agency plans, policies, and programs in the development of the [Amended RMP]").  The APA demands more.

160. BLM's flippant dismissal of the State's detailed and repeated objections renders the

Amended RMP arbitrary, capricious, and not in accord with either the consultation requirements of FLPMA or the reasoned decisionmaking requirements of the APA. *See Sierra Club v. Salazar*, 177 F.Supp.3d 512, 532 (D.C. Cir. 2016) (agency acts arbitrary and capriciously when "it fails to 'respond <u>meaningfully</u> to objections raised by a party'") (citation omitted, emphasis original).

### COUNT 10
### Arbitrary & Capricious Agency Action in Violation of the APA
### *Failure to Follow Own Regulations and Reliance on Improper Standards*

161. Plaintiff reasserts and incorporates by reference all preceding paragraphs.

162. Pursuant to BLM's RMP regulations, "the State Director shall approve the [resource management] plan." 43 C.F.R. § 1610.5-1(b).

163. But the State Director did not approve the Amended RMP. Instead, the Department of the Interior's Principal Deputy Assistant Secretary, Steven H. Feldgus, purported to approve the Amended RMP, stating his "decision constitutes the final decision of the Department of the Interior in accordance with the land use planning regulations at 43 CFR 1610." **Exhibit A** at 1-12.

164. BLM Regulations also require the agency to respond to every party that submits a protest on an RMP "by certified mail, return receipt requested." *See* 43 C.F.R. 1610.5-2(a)(3).

165. North Dakota submitted a formal protest to the Proposed RMP on September 9, 2024. *See* **Exhibit D.** However, upon knowledge and belief, the State never received a response from BLM "by certified mail, return receipt requested," that set forth in writing why the concerns raised in the State's protest letter were all categorically rejected by BLM.[8]

166. An agency must "adhere to its own regulations," *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986), and "an agency action may be set aside as arbitrary and

---

[8] In preparing for this lawsuit, counsel for the State located, through internet searching, a document entitled "Protest Resolution Report" buried on BLM's website. *See* BLM, Protest Resolution Report (Jan. 6, 2025), *available at* https://tinyurl.com/4hksnkpr. But posting a response on a website does not satisfy BLM's own notice requirements. 43 C.F.R. 1610.5-2(a)(3).

capricious if the agency fails to 'comply with its own regulations,' " *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)). "Although it is within the power of [an] agency to amend or repeal its own regulations, [an] agency is not free to ignore or violate its regulations while they remain in effect." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978).

167. BLM also improperly relied on Executive Order 13990 and the 2023 Social Cost of Greenhouse Gases Guidance ("2023 GHG Guidance") in justifying the Amended RMP, promoting climate change goals over FLPMA's multiple use mandate.[9]

168. The Final EIS expressly relies upon "estimates of the monetary value of changes in [GHG] emissions that could result from selecting each alternative" using the 2023 GHG Guidance. **Exhibit B** at 3-22 to 3-23.  And the Amended RMP, which explicitly adopts the Final EIS (**Exhibit A** at 1-1), relies on social cost of GHG estimates under "Section 5 of Executive Order 13990," which directs agencies to "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account."  *Id.*

169. But neither Executive Order 13990 nor the 2023 GHG Guidance are binding law, and their pronouncements about global climate damages justifying domestic rulemakings cannot contradict FLPMA's statutory mandates that require BLM to manage lands under a multiple use and sustained yield framework.

170. Because the BLM State Director did not approve the final Amended RMP in contravention of BLM's own regulations, because BLM did not respond to North Dakota's protest letter as required by its own regulations, and because BLM relied upon improper standards for

---

[9] Executive Order 13990 and the 2023 GHG Guidance have recently been rescinded. *See* Executive Order 14164, *Unleashing American Energy*, 90 Fed.Reg. 8353 at 8354, 8356 (Jan. 20, 2025).

promulgating the Rule, the Amended RMP is arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT**

171. Plaintiff respectfully requests that this Court enter judgment in its favor and:

1. Declare the Final EIS to be arbitrary, capricious, an abuse of discretion, and not in accordance with the requirements of NEPA;

2. Declare that the Amended RMP exceeds Defendants' statutory authority and violates FLPMA, the MLA, and the APA;

3. Declare the Amended RMP is arbitrary and capricious, an abuse of discretion, and not in accordance with law under the APA;

4. Vacate and enjoin implementation of the Amended RMP; and

5. Enter other preliminary or permanent injunctive relief as North Dakota may hereafter specifically seek or as the Court deems just and proper.

Date: February 25, 2025

DREW H. WRIGLEY
Attorney General
State of North Dakota

<table>
<tr><td></td><td><i>/s/ Philip Axt</i></td></tr>
<tr><td>JENNIFER FREEL<br>MIKE NASI<br>TRAVIS WUSSOW<br>Special Assistant Attorneys General<br>100 Congress St., Suite 1100<br>Austin, TX 78701<br>Phone: (512) 236-2330<br>Email: jfreel@jw.com<br>Email: mnasi@jw.com<br>Email: twussow@jw.com</td><td>PHILIP AXT<br>Solicitor General<br>600 E. Boulevard Ave., Dept. 125<br>Bismarck, ND 58505<br>Phone: (701) 328-2210<br>Email: pjaxt@nd.gov</td></tr>
</table>

*Counsel for State of North Dakota*
